KIRSTIN BLAISE LOBATO, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 40370

September 3, 2004                                         96 P.3d 765

*David M. Schieck,* Special Public Defender, and *Gloria M. Navarro,* Deputy Special Public Defender, Clark County, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *Sandra DiGiacomo,* Deputy District Attorney, Clark County, for Respondent.

---

Before SHEARING, C. J., ROSE and MAUPIN, JJ.

## OPINION

By the Court, MAUPIN, J.:

Appellant Kirstin Blaise Lobato appeals from a final judgment of conviction, entered following jury verdicts of guilty on separate counts of first-degree murder with the use of a deadly weapon and sexual penetration of a dead human body.[1] In this appeal, we consider whether the trial court erred by precluding Lobato from introducing extrinsic evidence to impeach the testimony of a witness for the State. We reverse Lobato's convictions and remand for a new trial.

### PROCEDURAL AND FACTUAL HISTORY

On July 8, 2001, Las Vegas Metropolitan Police Department (LVMPD) officers responded to a report of a dead body behind a dumpster on West Flamingo Road in Las Vegas, Nevada. Police later identified the body as that of Duran Bailey (the victim).

An autopsy revealed extensive wounds inflicted by sharp and blunt objects. The coroner testified that the victim's demise preceded discovery of the body by ten to eighteen hours, and that at least some of the documented blunt force injuries were consistent with an assault with a baseball bat or with a fall against a cement curb. However, the coroner identified several broken teeth, abrasions to the head, and a series of depressed and non-depressed skull injuries to the front, side and back of the head. Accordingly, his testimony strongly implied that at least some of the blunt trauma was exclusively attributable to an assault. The coroner also

---

[1]See NRS 177.015(3); NRS 193.165; NRS 200.030; NRS 201.010; NRS 201.450.

documented that the victim's penis was amputated at the base, and noted a slash wound between the victim's buttocks from above his anus, through and into the rectum, ending at the posterior aspect of the scrotum. These wounds were sustained post-mortem. Finally, the coroner attributed the victim's demise to a laceration of one of his carotid arteries.

At some point in mid-July 2001, Lobato, a resident of Panaca, Nevada, informed her former teacher and counselor that an older man attacked and attempted to sexually assault her during a recent visit to Las Vegas. She claimed to have cut off the attacker's penis. Some time later, LVMPD Detective Thomas Thowsen learned of Lobato's claim and proceeded to Panaca to interview her. Upon introducing himself to Lobato, Detective Thowsen stated he understood Lobato had been attacked in Las Vegas and been forced to defend herself. Lobato did not respond to this statement. In response to a statement by Detective Thowsen that he "knew she'd been hurt in the past," referring to his knowledge that Lobato was molested when she was six years old, Lobato began to cry and said, "I didn't think anybody would miss him."

Detective Thowsen then administered warnings pursuant to *Miranda v. Arizona,*[2] after which Lobato provided a recorded statement. She indicated that she had been assaulted previously in Las Vegas, that she used her butterfly knife to defend herself, and that she cut the man's penis, but she did not know if she completely severed it. She also stated that she managed to escape and left the assailant lying still on the ground and crying. When asked if she hit the man with anything other than her knife, Lobato stated "No, but it's poss—I have a baseball bat that I keep behind my seat or had a baseball bat."[3] Lobato was vague about the exact date and details of the incident, claiming she was high on drugs. As a result of the interview, the officers placed Lobato under arrest.

The State ultimately filed an amended criminal complaint charging Lobato with separate counts of murder with the use of a deadly weapon and sexual penetration of a dead human body. After a preliminary hearing, the justice court bound Lobato over for trial in district court on both offenses.

Detective Thowsen testified at trial concerning his investigation of the homicide and Lobato's statements.[4] Several witnesses testified for the State regarding other statements made by Lobato to the effect that she was attacked while in Las Vegas and used a knife in self-defense. These accounts varied concerning the extent to which she inflicted injuries upon her assailant—that she severed her at-

[2]384 U.S. 436 (1966).

[3]Forensic testing did not reveal any blood on Lobato's bat.

[4]The district court determined that Lobato voluntarily made her statements to Detective Thowsen and thus allowed him to testify concerning them.

tacker's penis, that she simply slashed the organ, or that she stabbed him in the abdomen.

Korinda Martin, an inmate at the Clark County Detention Center, testified to Lobato's boasts that she was in jail for murder and had forcibly amputated a man's penis and placed it "down his throat." More particularly, Martin indicated that Lobato expressed some worry over blood that might be found in her automobile because she had struck the man in the face and made a series of statements to the effect that she had picked up the assailant, "Darren," with whom she was acquainted, on a public street to purchase methamphetamine; that she was high on drugs; that "Darren" wanted to engage in sex with her and that she refused; that she stabbed him at least eight times in the rectum when he was lying still at the scene; and that, while the man never tried to force her to submit to his sexual advances, she was going to play the "poor me" act and claim that Darren had attempted to sexually assault her. According to Martin, after the State added the sexual penetration charge, Lobato boasted that what she had done was overkill, but that "Darren" deserved it.

Martin testified that she contacted the district attorney's office after her conversations with Lobato and provided police detectives with a statement concerning them. While she requested a letter of recommendation to the parole board in exchange for her testimony, none was forthcoming.

During the State's direct examination, Martin admitted to a prior robbery conviction. However, on cross-examination, she admitted to separate convictions for robbery and coercion. Martin also admitted that she had unsuccessfully attempted to secure her release from custody on several occasions via motions for bail, house arrest, release on her own recognizance, and bail reduction. She admitted that one of the motions was based upon a claim that she was pregnant and that the pregnancy was high risk. Martin stated that, while she would have done whatever was necessary to get out of jail, she would not lie, have someone lie for her, or assist someone to lie to a court.

During a recess hearing outside the presence of the jury, Lobato confronted Martin with two handwritten letters that supported the proposition that Martin had engaged in an attempted fraud upon the sentencing judge in her case. One of the letters was a "cover" letter, purportedly from "Korinda," requesting that "Brenda Self," one of Martin's former co-prisoners, copy an attached recommendation letter in her own handwriting and send it to Martin's sentencing court. The attachment was designed to advise the court that Martin was experiencing a high-risk pregnancy and that Brenda hired Martin in November 2000 and continued to employ her. The letter further stated that Brenda would personally assist Martin

in any way possible. Although Martin denied sending, writing, or having seen either of the letters, Martin agreed that the letter constituted a fraud upon her sentencing court because she had never worked for Brenda. Interestingly, the envelope in which the defense presented the letters bore Martin's return address and prison ''body number.''

Following Martin's in camera testimony, the State agreed to a handwriting analysis of the letters, and the parties deferred the line of inquiry until the opinion could be secured. When the trial recommenced, Lobato examined Martin concerning prior convictions and attempts to avoid further prison time but made no inquiry about the letters. Later in the proceedings, when Lobato attempted to present her expert's preliminary opinion that Martin wrote the contested letters, the district court excluded any extrinsic evidence concerning authorship of the letters as collateral to the proceedings under NRS 50.085(3).[5] Ultimately, the jury heard no evidence regarding the letters, including Martin's denial of any connection with them.

Lobato also sought to have Brenda Self testify to Martin's attempt to mislead her sentencing court. Consistent with its prior ruling excluding the handwriting analysis of the letters, the district court denied the request and ruled that, if Self testified, Lobato could elicit Self's opinion of Martin's truthfulness without reference to any conduct giving rise to that opinion.[6] Following this ruling, Lobato decided not to present Self's testimony.

Lobato testified in her own defense, claiming essentially that an unknown assailant attempted to sexually assault her, and that she resisted, cut him with a knife and fled the area.

The jury returned verdicts of guilty on both charges. Shortly thereafter, a document examiner for the LVMPD filed a report concluding that Martin wrote at least one of the contested letters.[7] The district court denied Lobato's motion for a new trial based in part upon this new information.

The district court imposed consecutive 20- to 50-year sentences for first-degree murder with the use of a deadly weapon, and a

---

[5]NRS 50.085(3) states:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime, may not be proved by extrinsic evidence. They may, however, if relevant to truthfulness, be inquired into on cross-examination of the witness himself or on cross-examination of a witness who testifies to an opinion of his character for truthfulness or untruthfulness, subject to the general limitations upon relevant evidence and the limitations upon interrogation and subject to the provisions of NRS 50.090.

[6]*Id.*

[7]The LVMPD expert concluded that Martin probably authored the first letter and definitely the second.

5- to 15-year sentence for sexual penetration of a dead body. In addition, the district court imposed a special sentence of lifetime supervision should Lobato be released. Finally, the district court ordered genetic marker testing, along with payments of a $150 DNA analysis fee, a fine of $10,000 and a $25 administrative assessment. The court credited Lobato 233 days for time served prior to the imposition of sentence. Lobato filed her timely notice of appeal.

## DISCUSSION

### Impeachment by extrinsic evidence

Lobato argues that the district court erroneously excluded extrinsic evidence rebutting Martin's denial that she sought to perpetrate a fraud upon her own sentencing court. More particularly, she asserts that the letters, the expert handwriting opinions and Brenda Self's testimony, although extrinsic, were admissible on the question of Martin's credibility. We agree and reverse Lobato's conviction and remand for a new trial.

There are nine basic modes of impeachment. The first four involve attacks upon the competence of a witness to testify, *i.e.*, attacks based upon defects of perception, memory, communication and ability to understand the oath to testify truthfully. The second four modes of impeachment involve the use of evidence of prior convictions,[8] prior inconsistent statements, specific incidents of conduct and ulterior motives for testifying. The ninth mode of impeachment, not pertinent to this appeal, permits attack upon a witness's reputation for truthfulness and necessarily involves the use of extrinsic evidence.

Impeachment by use of extrinsic evidence is prohibited when collateral to the proceedings. Collateral facts are by nature ''outside the controversy, or are not directly connected with the principal matter or issue in dispute.''[9] The ''collateral fact'' rule, however, has only limited application. For example, extrinsic evidence that is relevant to any of the first four modes of impeachment is never collateral and thus is always admissible for impeachment purposes.[10] Also, use of prior felony convictions and reputation evidence do not implicate the prohibition against collateral extrinsic

---

[8]NRS 50.095(1) states:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime is admissible but only if the crime was punishable by death or imprisonment for more than 1 year under the law under which he was convicted.

[9]*Black's Law Dictionary* 262 (6th ed. 1990).

[10]1 John W. Strong, *McCormick on Evidence* § 49 (5th ed. 1999) [hereinafter *McCormick*].

evidence. And extrinsic evidence relevant to prove a witness's motive to testify in a certain way, *i.e.,* bias, interest, corruption or prejudice, is never collateral to the controversy and not subject to the limitations contained in NRS 50.085(3).[11] However, use of specific instances of conduct—*i.e.,* an untruthful act not resulting in a conviction—and use of prior inconsistent statements, raise issues under the so-called collateral-fact rule when coupled with a specific contradiction.

Thus, only two modes of impeachment truly implicate the collateral-fact rule. Accordingly, extrinsic proof of a prior inconsistent statement is inadmissible unless the statement is material to the case at hand.[12] And NRS 50.085(3) limits the admissibility of extrinsic evidence for the purpose of attacking credibility based upon specific instances of conduct attributable to the witness. Unless in some way related to the case and admissible on other grounds, extrinsic prior bad act evidence is always collateral and therefore inadmissible to attack credibility.

The State correctly concedes in its arguments before this court that cross-examination of Martin as to whether she wrote the fraudulent letters would have been proper. However, it also correctly argues that the letters, the expert opinions and Self's proposed testimony contradicting Martin's denial of authorship were all inadmissible under NRS 50.085(3) as extrinsic evidence of specific instances of untruthfulness; here, her attempts at subornation of perjury in her separate criminal case.[13] Certainly, evidence

[11]*See id.* (stating that proof of a witness's bias, interest, corruption or coercion is exempt from the collateral-fact rule); *see also* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 608.20[3][b] (Joseph M. McLaughlin ed., 2d ed. 2004) (stating that Federal Rule of Evidence 608(b) (which is substantially similar to NRS 50.085(3)) is not implicated when extrinsic evidence is sought to be admitted on the issue of bias; rather its admissibility depends upon whether the bias is a relevant issue in the case); 3A John Henry Wigmore, *Wigmore on Evidence* § 948, at 783 (Chadbourn rev., 1970) ("The doctrine of excluding facts offered by extrinsic testimony has never been applied to [the subject of bias]."); *id.* § 1005(b) ("Particular circumstances and expressions indicating bias are provable by extrinsic testimony . . . .").

[12]*See McCormick, supra* note 10, § 49 (identifying two methods by which extrinsic evidence of a prior inconsistent statement is non-collateral: (1) "if the matter is itself relevant to a fact of consequence on the historical merits of the case" and (2) if the extrinsic evidence relates to a "linchpin" fact of the case).

[13]Although the district court ultimately excluded the extrinsic evidence of Martin's attempted fraud upon her own sentencing court, the district court never expressly precluded Lobato from cross-examining Martin regarding whether she wrote the letters. Lobato failed, however, to request that the district court permit her to recall Martin for that purpose. Ordinarily, the failure

proving that Martin had attempted to induce another person to lie for her was immaterial in and of itself to the question of whether Lobato committed homicide. We conclude, however, that evidence disproving Martin's denial that she wrote the letters was admissible for another purpose, to wit: to prove Martin's motive, *i.e.,* interest, for testifying for the State.

Although district courts have wide discretion to control cross-examination that attacks a witness's general credibility, a "trial court's discretion is . . . narrow[ed] where bias [motive] is the object to be shown, and an examiner must be permitted to elicit any facts which might color a witness's testimony."[14] Generally, "[t]he only proper restriction should be those inquiries which are repetitive, irrelevant, vague, speculative, or designed merely to harass, annoy or humiliate the witness."[15]

The proffered letters and extrinsic evidence relating to them confirmed Martin's desperation to obtain an early release from incarceration and her willingness to adopt a fraudulent course of action to achieve that goal. As Martin testified before the jury, she would have done "whatever it took to get out of jail" in July and August 2001. While the jury heard evidence regarding Martin's other unsuccessful attempts to gain her own release from custody, the extrinsic evidence from the experts and Brenda Self would have supported a very important inference that Martin's cooperation was simply part of a continuum of deceptions taken to secure her freedom. We conclude that the extrinsic evidence concerning the letters demonstrated her strong interest in assisting the State in Lobato's trial. Thus, the extrinsic evidence in this case was admissible because it was relevant to a mode of impeachment that does not implicate the collateral-fact rule—motivation to give false testimony. We therefore hold that the district court erred by not permitting

---

to ask the impeaching question about prior untruthful acts waives any issue on appeal concerning the propriety of the impeachment itself. We conclude, however, that Lobato's questioning of Martin regarding authorship and knowledge of the letters outside the presence of the jury, along with the definitive exclusionary ruling, were sufficient to preserve for appeal the issue of whether extrinsic evidence on that issue was admissible. *See Pineda v. State,* 120 Nev. 204, 88 P.3d 827 (2004); *Richmond v. State,* 118 Nev. 924, 59 P.3d 1249 (2002).

[14]*Bushnell v. State,* 95 Nev. 570, 572, 599 P.2d 1038, 1040 (1979); *see also Ransey v. State,* 100 Nev. 277, 279, 680 P.2d 596, 597 (1984) (" 'Where [the] purpose of [cross-examination] is to expose bias . . . [the] examiner must be permitted to elicit any facts which might color a witness' testimony,' and the trial court's usual discretion to control the scope of cross-examination is circumscribed." (quoting *Eckert v. State,* 96 Nev. 96, 101, 605 P.2d 617, 620 (1980))); *Jones v. State,* 108 Nev. 651, 659, 837 P.2d 1349, 1354 (1992).

[15]*Bushnell,* 95 Nev. at 573, 599 P.2d at 1040.

Lobato to introduce extrinsic evidence to impeach Martin on the issue of her motive to testify.[16]

Having held that there was error in the record, we must consider whether that error was harmless. NRS 178.598 directs that any error that does not affect a defendant's substantial rights shall be disregarded. The "exclusion of a witness' testimony is prejudicial if there is a reasonable probability that the witness' testimony would have affected the outcome of the trial."[17] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[18]

Lobato validly characterizes Martin as the State's "star witness." The physical evidence, multiple trauma and the evident use of multiple weapons circumstantially supported a number of theories of criminal culpability, *i.e.*, manslaughter, second-degree murder and first-degree murder. But Lobato's purported admissions to Martin suggested that she was not motivated by a need to defend herself against a sexual assault by the victim, that she had conjured up a false defense to the homicide, and that her actions were simply overkill. Martin certainly provided evidence of Lobato's motivations connected to an illicit drug transaction involving a person with whom she was acquainted, that Lobato was the initial aggressor, and contradicted Lobato's statements that an unknown assailant precipitated the attack. In short, Martin's testimony powerfully underscored the State's circumstantially supported theories of malice and premeditation and substantially undermined Lobato's alternate

---

[16]The present matter is distinct from prior cases in which we ruled that extrinsic evidence was inadmissible and therefore collateral. Those cases dealt with evidence of a witness's prior bad acts, not inquiry into a witness's bias or interest, and we ruled that the use of extrinsic evidence in such situations was impermissible. *See, e.g., Collman v. State,* 116 Nev. 687, 7 P.3d 426 (2000) (district court properly precluded questioning a state witness regarding an abortion; such evidence was immaterial to the question of whether the defendant committed homicide and therefore inadmissible); *McKee v. State,* 112 Nev. 642, 917 P.2d 940 (1996) (error for prosecutor to impeach defendant with extrinsic evidence regarding drug use on a specific day; such evidence was irrelevant to whether defendant trafficked drugs on another day and was therefore inadmissible collateral evidence); *Rowbottom v. State,* 105 Nev. 472, 779 P.2d 934 (1989) (error to admit extrinsic evidence of prior bad act to impeach defendant's credibility; prosecutor could only impeach by questioning defendant about the act during defendant's own testimony, not by introducing extrinsic evidence); *Rembert v. State,* 104 Nev. 680, 766 P.2d 890 (1988) (error to allow State to introduce immaterial extrinsic evidence of defendant's termination from employment; the issue at trial was whether defendant had the opportunity to commit sexual assault; therefore, the extrinsic evidence was collateral).

[17]*Bell v. State,* 110 Nev. 1210, 1215, 885 P.2d 1311, 1315 (1994).

[18]*Strickland v. Washington,* 466 U.S. 668, 694 (1984).

claims of self-defense and lesser culpability.[19] Because of the equivocal and circumstantial nature of the other evidence supporting the State's allegations of first-degree murder, we cannot conclude that the district court's error was harmless. We therefore conclude that the exclusion of evidence of Martin's interest in assisting the State constitutes reversible error. In this we wish to stress that in any criminal case, where issues of guilt are close, the testimony of a jailhouse informant should be regarded with particular scrutiny.

*Miscellaneous assignments of error*

Lobato also contends that the district court erred in admitting her statements to police in violation of *Miranda,* allowing the State to obtain and use privileged material from her medical files, restricting use of her expert on blood and crime-scene analysis based upon her failure to timely designate the expert before trial, excluding her alibi evidence for lack of timely pretrial notice, and allowing prosecutorial misconduct during final argument. We have considered these assignments of error and find them without merit. We note in passing that the failures to timely designate experts and alibi witnesses may be cured upon remand.[20] We also reject Lobato's remaining claims of error, including the assertion that NRS 201.450[21] was unconstitutionally applied and is void for vagueness.[22]

## CONCLUSION

The district court erred in precluding the defense from fully impeaching a State's witness. Because the error is not harmless, we reverse Lobato's conviction and remand for a new trial.

SHEARING, C. J., and ROSE, J., concur.

---

[19]Because no physical evidence tied Lobato to the homicide, Lobato's statements to other witnesses were circumstantially consistent with theories of self-defense, manslaughter and second-degree murder.

[20]While Lobato's claims of self-defense and her presentation of alibi witnesses are antagonistic, the parties can resolve the theories of defense upon retrial of this matter.

[21]NRS 201.450(2) states:

For the purposes of this section, ''sexual penetration'' means cunnilingus, fellatio or any intrusion, however slight, of any part of a person's body or any object manipulated or inserted by a person into the genital or anal openings of the body of another, including, without limitation, sexual intercourse in what would be its ordinary meaning if practiced upon the living.

[22]*See Doyle v. State,* 112 Nev. 879, 900 n.8, 921 P.2d 901, 914 n.8 (1996) (stating that the plain meaning of NRS 201.450 ''is to punish the act of sexual penetration of a dead human body, regardless of motive''), *overruled on other grounds by Kaczmarek v. State,* 120 Nev. 314, 91 P.3d 16 (2004).