MICHAEL JEZDIK, Appellant, v. THE STATE OF
NEVADA, Respondent.

No. 41876

May 12, 2005                    110 P.3d 1058

*Carmine J. Colucci & Associates* and *Carmine J. Colucci,* Las
Vegas, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,*
District Attorney, and *James Tufteland,* Chief Deputy District
Attorney, Clark County, for Respondent.

Before MAUPIN, DOUGLAS and PARRAGUIRRE, JJ.

## OPINION

By the Court, MAUPIN, J.:

In this appeal we consider the extent to which the State may rebut character evidence introduced by the defendant in a criminal case.

This matter involves allegations of identity theft and fraudulent use of a credit card. The State initially filed charges against appellant Michael Jezdik[1] relating to numerous purchases made in Nevada and California in late April and early May of 2001. However, unable to obtain receipts supporting many of the charges, the State ultimately only pursued charges concerning purchases at three Las Vegas grocery stores on May 6, 2001: Vons, Albertsons, and Raley's. A jury convicted Jezdik on a single count of obtain-

---

[1]We note that the district court documents reflect different spellings of appellant's name: Michal and Michael. Because the judgment of conviction spells appellant's first name as Michael, that is the spelling we will use in this opinion.

ing and using identification of another,[2] three counts of fraudulent use of a credit card,[3] and two counts of burglary.[4]

Jezdik contends on appeal that: (1) the district court erred in allowing the State to introduce prior bad act evidence in rebuttal to Jezdik's character testimony on direct examination, (2) the district court's admission of lay witness testimony regarding handwriting comparisons constitutes plain error, (3) insufficient evidence supports the verdicts, (4) his trial counsel rendered ineffective assistance, and (5) cumulative error warrants reversal. We conclude that the district court properly allowed admission of rebuttal evidence in response to improper evidence of character either intentionally or inadvertently introduced during defense counsel's direct examination of Jezdik. Further, with the exception of one count of fraudulent use and one count of burglary, we conclude that sufficient evidence supports the verdicts. Finally, we decline to reach Jezdik's claims of ineffective assistance of counsel[5] and conclude that Jezdik's remaining assignments of error are without merit.

## FACTS AND PROCEDURAL HISTORY

Jezdik and the victim in this case, Anna Behran, are both Czechoslovakian immigrants who met in Las Vegas in early 1997. They became romantically involved for a brief period but soon parted ways. Near the end of 2000, they renewed their friendship. Shortly thereafter, Behran informed Jezdik that she was interested in purchasing a home but was uncertain of the process. Jezdik, who had just completed a mortgage application himself, informed Behran that she could complete a mortgage application online and save money. According to her trial testimony, Jezdik offered to help her with the transaction with the aid of his personal home computer.

In February or March 2001, Behran and Jezdik completed an online mortgage application from Jezdik's residence, located at 3400 Termination Court in Las Vegas. During the application process, Jezdik gained access to Behran's social security number, her mother's maiden name and other confidential information. Behran testified at trial that Jezdik and her estranged husband were the only people with access to this information. Behran fur-

---

[2]NRS 205.463.

[3]NRS 205.760.

[4]NRS 205.060.

[5]*See Feazell v. State,* 111 Nev. 1446, 1449, 906 P.2d 727, 729 (1995) (stating that claims of ineffective assistance of counsel ''may not be raised on direct appeal, unless there has already been an evidentiary hearing'').

ther testified that she never gave Jezdik permission to use her personal information to obtain a credit card and that she never went to Jezdik's Termination Court address for any purpose other than to generate the mortgage application.

Terry Chodosh, a fraud investigator for Citibank, testified that, on April 2, 2001, Citibank received an online application for a MasterCard listing Anna Behran as the primary cardholder and Michael Jezdik as the secondary cardholder. The application required Behran's social security number and date of birth, provided an address of 3400 Termination Court, and stated that Behran worked for a firm known as Southwest Advertising, Jezdik's employer. Because the application listed Jezdik as a secondary cardholder, Citibank did not require his personal information. Although previously a Citibank cardholder, Behran disclaimed any responsibility for the April 2, 2001, application. She also denied at trial that she had used Jezdik's address for the purpose of receiving mail and denied ever working for Southwest Advertising.

Citibank approved the application on April 19, 2001, and sent two cards to 3400 Termination Court. Subsequent bills went unpaid. Behran testified that she became aware of the second account after receiving Citibank correspondence regarding a recent change of her account address from Termination Court to another Las Vegas address on Flaming Coral Lane. Other testimony at trial established that Jezdik moved from Termination Court to Flaming Coral Lane in May 2001. Citibank's security operations department closed the account in August 2001 at Behran's request.

As part of the subsequent fraud investigation, Detective John Woosnam of the Las Vegas Metropolitan Police Department (LVMPD) contacted a Citibank investigator, learned that Citibank suffered losses in connection with the account, and obtained copies of three receipts and the billing statements. The statements revealed seventeen purchases made between April 25 and May 6, 2001. Four of the transactions occurred in California between April 26 and April 28, 2001. The State ultimately argued that Behran could not have made the California charges because she was in Hawaii at the time.[6] Behran's personal bank statements, admitted at trial, confirmed transactions in Hawaii on April 23, 25, and 26, 2001.

At trial, Detective Woosnam conducted a lay comparison of Jezdik's signature with the Citibank receipts. While Detective Woosnam admitted he was not an expert, he testified that ''based

---

[6]The California transactions were not the subject of the charges below. However, the State admitted evidence relating to these transactions without objection.

on general experience . . . [t]he signature on the receipts [is] similar in appearance with the signature that appeared on the copy of the voluntary statement . . . obtained from [Michael] Jezdik." Based on this similarity, Woosnam testified that it was his opinion "that the signatures are from the same person, [Michael] Jezdik."

Gene Olewinski, a detective in the LVMPD financial crimes unit, also participated in the investigation concerning Jezdik. Olewinski testified at trial that, as part of the investigation, he required Jezdik to execute exemplar signatures for expert handwriting analysis. Attempts to make comparisons failed due to the type and quality of the signatures on the receipt copies.

The defense theorized that Behran herself opened the Citibank account and was motivated financially to deny ownership of the account. Jezdik testified in his own defense that he and Behran had renewed a romantic relationship at the time of the events in question, that Behran enjoyed unrestricted access to the Termination Court residence, and that she could have used his computer to complete the credit card application in his absence. Jezdik further testified that Behran received mail at both Termination Court and Flaming Coral Lane even after he instructed her to change her mailing address, and that he and Behran were in fact coworkers at Southwest Advertising. The defense also attempted to establish that Jezdik could not have made several of the alleged charges in Nevada because he was in California on some of the days of the alleged transactions on the Citibank card, and that Jezdik originally gained access to Behran's personal information during their first relationship but had never made use of it.

In an apparent attempt to establish Jezdik's good character, defense counsel asked Jezdik on direct examination, "Have you ever been accused of anything prior to these current charges?" Jezdik responded, "No." The prosecutor then asked to approach the bench and a brief conference occurred off the record. When testimony resumed, defense counsel proceeded to a different line of questioning. Later, outside the jury's presence, the State argued that the "no accusation" evidence "opened the door" to specific rebuttal concerning misconduct similar to that charged in the case. After reviewing a tape-recorded transcript provided by the State, the district court ultimately allowed the testimony of two rebuttal witnesses.

Pursuant to the ruling, Detective Olewinski testified concerning another ongoing investigation of Jezdik. The record does not reveal the nature of this alleged offense or whether Jezdik was aware that he was under investigation, but the record clearly shows that the State had not formally charged Jezdik with any offense relating to it.

Karel Kothera, Jezdik's father-in-law, additionally testified for the State that Jezdik and Kothera's daughter, Monica, approached him sometime during 2001 asking for his assistance in purchasing

a home. Kothera agreed to help and provided Monica a power of attorney with his personal information to complete the loan paperwork. Kothera further testified that he became aware that an unauthorized credit card had been opened under his name when Jezdik and Monica told him that the authorities found a credit card in Kothera's name at their residence. Kothera testified that he never gave Jezdik or Monica permission to use a credit card issued in his name, that Jezdik admitted to opening the account, that the unauthorized card carried a balance over $5,000, and that Jezdik and Monica asked him to "cover it up" to protect Jezdik. Kothera further testified that he did not immediately become aware of the alleged fraud because the credit card company sent the billing statements to Jezdik who, in turn, made payments on the account.

The jury returned verdicts of guilty on all charges. The district court sentenced Jezdik to 12 to 48 months imprisonment on a single count of identity theft, and concurrent sentences of 12 to 30 months on the remaining charges. The court suspended these sentences and placed him on probation for an indeterminate period, not to exceed four years.[7] Jezdik timely filed his notice of appeal.

## DISCUSSION

*Rebuttal evidence specifically contradicting a defendant's proffered character evidence*

Jezdik argues that the testimony of Detective Olewinski and Karl Kothera constitutes improper character evidence under NRS 48.045 and improper impeachment under NRS 50.085. The State argues that neither of these provisions applies because the State introduced the testimony to rebut Jezdik's own testimony on direct examination.

This court reviews a district court's decision to admit or exclude evidence for an abuse of discretion.[8] NRS 48.045(1) states the general rule regarding the admissibility of character evidence in a criminal trial:

> 1. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
>
> (a) Evidence of his character or a trait of his character offered by an accused, and *similar evidence offered by the prosecution to rebut such evidence* . . . .

---

[7]The court also ordered Jezdik to pay $3,361.70 in restitution, a $150.00 DNA analysis fee, and a $25.00 administrative assessment.

[8]*E.g., Collman v. State,* 116 Nev. 687, 704, 7 P.3d 426, 437 (2000).

(Emphasis added.) Thus, NRS 48.045(1)(a) gives the defendant the sole election to place his character in issue. NRS 48.055 provides the general mechanism for proving character under NRS 48.045:

> 1. In all cases in which evidence of character or a trait of character of a person is admissible, *proof may be made by testimony as to reputation or in the form of an opinion.* On cross-examination, inquiry may be made into specific instances of conduct.

(Emphasis added.)

As a general matter, when a defendant chooses to introduce character evidence in the form of reputation or opinion evidence, the prosecution is similarly limited in its rebuttal evidence and can only inquire into specific acts of conduct on cross-examination. Here, however, Jezdik did not place his character in issue as specified by one of the exclusive means provided in NRS 48.055: reputation or opinion evidence. Rather, he placed his character in issue through testimony that he had never been "accused of anything prior to these current charges." As such, we reject Jezdik's assertion that counsel's question "was an over-vague non-specific question [which] had no real impact on the State's case." Quite to the contrary, this statement in effect denies any prior specific instances of criminal misconduct.

We also reject Jezdik's contention that Detective Olewinski's testimony improperly exposed the jury to testimony about other alleged uncharged crimes.[9] First, under these discrete circumstances, we conclude that NRS 48.045(1)(a) permits rebuttal of Jezdik's testimony of good character with "similar evidence offered by the prosecution." Second, as discussed below, we conclude that such evidence is also admissible to impeach Jezdik's credibility.

At common law, a party could attack an opposing witness's credibility by offering contradictory testimony.[10] Over time, courts developed restrictions to specific contradiction evidence, the foremost of which is the "collateral fact rule."[11] Under this doctrine,

[9]*See* NRS 48.045(2).

[10]Francis A. Gilligan & Edward J. Imwinkelried, *Bringing the "Opening the Door" Theory to a Close: The Tendency to Overlook the Specific Contradiction Doctrine in Evidence Law,* 41 Santa Clara L. Rev. 807, 810 (2001) (citing 3A John Henry Wigmore, *Evidence in Trials at Common Law* §§ 1000-1007 (Chadbourn rev. 1970)).

[11]*See id.* at 811.

''[i]t is error to allow the State to impeach a defendant's credibility with extrinsic evidence relating to a collateral matter.''[12] Facts are collateral if they are '' 'outside the controversy, or are not directly connected with the principal matter or issue in dispute.' ''[13] Yet, under NRS 50.085(3), a party can impeach a witness on collateral matters during cross-examination ''with questions about specific acts as long as the impeachment pertains to truthfulness or untruthfulness and no extrinsic evidence is used.''[14]

As this court recently noted in *Lobato v. State,* the collateral-fact rule has limited application.[15] The rule does not limit the scope of cross-examination; an examiner can question a witness on practically any aspect of the witness's direct testimony.[16] Thus, the ''core prohibition [of the collateral-fact rule] applies when the witness to be impeached has already left the stand and the former cross-examiner later calls a second witness or proffers an exhibit to impeach the earlier witness's credibility.''[17] The policy behind this rule is to prevent the cross-examiner from injecting collateral matters into the trial by setting the witness up and then allowing the very party that injected the matter into the trial to impeach the witness's credibility with extrinsic evidence relating to those collateral matters.[18] Even so, most methods of impeachment are exempt from the collateral-fact rule.[19] For example, the rule does not apply to attacks on a witness's ulterior motive for testifying, attacks on a witness's capacity or personal knowledge, or impeachment using

---

[12]*McKee v. State,* 112 Nev. 642, 646, 917 P.2d 940, 943 (1996).

[13]*Lobato v. State,* 120 Nev. 512, 518, 96 P.3d 765, 770 (2004) (quoting *Black's Law Dictionary* 262 (6th ed. 1990)).

[14]*Collman,* 116 Nev. at 703, 7 P.3d at 436; *see also* NRS 50.085(3) (''Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime, may not be proved by extrinsic evidence. They may, however, if relevant to truthfulness, be inquired into on cross-examination of the witness himself or on cross-examination of a witness who testifies to an opinion of his character for truthfulness or untruthfulness, subject to the general limitations upon relevant evidence and the limitations upon interrogation and subject to the provisions of NRS 50.090.'').

[15]120 Nev. at 518, 96 P.3d at 770 (''[i]mpeachment by use of extrinsic evidence is prohibited when collateral to the proceedings'').

[16]*See* NRS 50.085(3); *see also* 1 John W. Strong, et al., *McCormick on Evidence* § 49, at 200 (5th ed. 1999) (hereinafter *McCormick*).

[17]*McCormick, supra* note 16, § 49, at 201 (footnote omitted); *see also McKee,* 112 Nev. at 646-47, 917 P.2d at 942-43.

[18]*Cf. McKee,* 112 Nev. at 646, 917 P.2d at 942-43.

[19]*McCormick, supra* note 16, § 49, at 201.

criminal convictions.[20] As noted in *Lobato,* the collateral-fact rule only truly applies when a specific contradiction is coupled with impeachment by a prior inconsistent statement or impeachment using extrinsic prior bad acts not resulting in a conviction.[21]

A specific contradiction involving extrinsic evidence of a prior bad act generally implicates the collateral-fact rule embodied in NRS 50.085(3).[22] However, authorities have noted an exception to the collateral-fact rule when the State "seeks to introduce evidence on rebuttal to contradict specific factual assertions raised during the accused's direct examination."[23] Under this exception, the defendant's false statements on direct examination trigger or "open the door" to the curative admissibility of specific contradiction evidence.[24] The example in *McCormick* is illustrative:

> Suppose, for example, that on direct examination, an accused witness made a sweeping, superlative assertion that he had "never" committed a deceitful act. That assertion is such a serious violation of the rules limiting bolstering evidence that on a curative admissibility theory, many courts allow the opposing counsel to both cross-examine about the assertion and later introduce extrinsic evidence rebutting the assertion.[25]

We have never explicitly embraced the modern doctrine of "specific contradiction."[26] However, a review of our case law reveals implicit acceptance on previous occasions. For example, in *Allen v. State,* we affirmed the State's use of collateral act testimony to impeach the defendant's own testimony on direct examination.[27] We reasoned that the impeachment provided a " 'valuable aid to the

---

[20]*See Lobato,* 120 Nev. at 518-19, 96 P.3d at 770 (citing *McCormick, supra* note 16, § 49; 4 Jack B. Weinstein & Margaret A Berger, *Weinstein's Federal Evidence* § 608.20[3][b] (Joseph M. McLaughlin ed., 2d ed. 2004)).

[21]*Id.*

[22]*See id.*

[23]*McCormick, supra* note 16, § 49, at 202.

[24]*Id.*

[25]*Id.; see also U.S. v. Beltran-Rios,* 878 F.2d 1208, 1212-13 (9th Cir. 1989) (allowing government "to introduce otherwise excludable testimony when the defendant 'opens the door' by introducing potentially misleading testimony").

[26]*See Roever v. State,* 114 Nev. 867, 878 n.11, 963 P.2d 503, 510 n.11 (1998) (MAUPIN, J., concurring) (noting that this court should address the "modern doctrine of 'specific contradiction' " in an "appropriate future case").

[27]94 Nev. 285, 286-87, 579 P.2d 771, 772 (1978).

jury in assessing [appellant's] credibility.' ''[28] Thus, we held the evidence properly admissible as being more probative than prejudicial.[29] Of particular note, we quoted Chief Justice Burger's rationale in *Harris v. New York*:

> ''Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. Having voluntarily taken the stand, [appellant] was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.''[30]

Similarly, in *Bostic v. State,* we held the admission of specific contradiction evidence proper when the defendant testified in his own defense.[31] We stated in *Bostic* that testimony for ''the purpose of contradicting [the defendant's] testimony is clearly distinguishable from the use of specific acts of misconduct to impeach the accused's character or credibility.''[32]

We cannot pervert the shield provided by NRS 50.085(3) into a license for a defendant to purposefully, or even inadvertently, introduce evidence giving the jury a false impression through an absolute denial of misconduct and then frustrate the State's attempt to contradict this evidence through proof of specific acts.[33] As a result, we adopt a limited exception to the collateral-fact rule and hold that our statutory rules of evidence do not prohibit a party from introducing extrinsic evidence specifically rebutting the adversary's proffered evidence of good character.[34]

However, when a party resorts to extrinsic evidence to show a specific contradiction with the adversary's proffered testimony, the evidence should squarely contradict the adverse testimony.[35] In

---

[28]*Id.* at 286, 579 P.2d at 772 (quoting *Harris v. New York,* 401 U.S. 222, 225 (1971) (alteration in original)).

[29]*Id.* (citing NRS 50.085 and NRS 48.035).

[30]*Id.* at 287, 579 P.2d at 772 (quoting *Harris,* 401 U.S. at 225 (alteration in original) (citations omitted)).

[31]104 Nev. 367, 371-72, 760 P.2d 1241, 1244 (1988).

[32]*Id.*

[33]*Cf. Harris,* 401 U.S. at 226.

[34]To the extent that *Rowbottom v. State,* 105 Nev. 472, 483-85, 779 P.2d 934, 941-42 (1989), is inconsistent with this opinion, it is overruled.

[35]*See* Gilligan & Imwinkelried, *supra* note 10, at 829-30.

this respect, Jezdik asserts that Kothera's "vague and unclear" testimony did not directly contradict Jezdik's denial of prior accusations. We disagree. Kothera explicitly testified that Jezdik admitted to wrongfully obtaining a credit card in Kothera's name, and that Jezdik attempted to persuade Kothera to conceal the fraud after the authorities discovered the card in Jezdik's home. Further, while neither Kothera's nor Olewinksi's testimony explicitly established that Jezdik was aware that "accusations" had been lodged against him, we conclude that the State's rebuttal testimony squarely contradicted the potentially false impression that Jezdik's testimony left in the eyes of the jurors. Thus, the district court did not abuse its discretion in permitting the State to rebut Jezdik's misleading testimony.

## Lay opinion on signature

Jezdik next argues that it was plain error to allow Detective Woosnam to testify as a lay witness that the signatures on the store receipts matched the signature on Jezdik's voluntary statement. Testimony at trial established Woosnam had no training in handwriting analysis. Thus, it appears at first blush that his testimony that the signatures matched was improper under NRS 50.265(2) as being unhelpful to the jury.[36] However, defense counsel's reason for not objecting to the testimony is not apparent on this record. As a result, we decline to reach this issue under a plain error analysis,[37] and like Jezdik's other claims of ineffective assistance of counsel, we reserve decision on the merits of any related ineffective-assistance claim for future post-conviction review.[38]

## Insufficiency of evidence/incorrect information

While not raised on appeal, we sua sponte address a problem with the State's proof of facts alleged in the amended information below.[39] As noted above, the amended information charges Jezdik

[36]See Collins v. State, 113 Nev. 1177, 1184, 946 P.2d 1055, 1060 (1997) (holding an officer's opinion, based on experience, was helpful to determination of a fact at issue); see also Hall v. United Ins. Co. of America, 367 F.3d 1255, 1259 (11th Cir. 2004) (explaining the interplay between FRE 901 and 701 in the context of documents containing handwriting and holding both must be satisfied before lay witness testimony concerning handwriting is admissible); accord U.S. v. Scott, 270 F.3d 30, 48-50 (1st Cir. 2001).

[37]Cf. Green v. State, 119 Nev. 542, 545, 80 P.3d 93, 94-95 (2003).

[38]See Feazell v. State, 111 Nev. 1446, 1449, 906 P.2d 727, 729 (1995).

[39]See Sterling v. State, 108 Nev. 391, 394, 834 P.2d 400, 402 (1992).

with burglary and fraudulent use of a credit card in connection with three May 6, 2001, purchases made at three separate grocery stores: Vons, Albertsons, and Raley's.

At trial, the State produced receipts from three grocery stores. Two of these receipts concerned purchases made at Albertsons and Raley's on May 6, 2001. However, the other receipt admitted at trial concerned a purchase made on April 27, 2001, at Smith's grocery store. The Vons' allegations did not relate to that purchase.

This defect of proof is not harmless because the State otherwise failed to place Jezdik at Vons on May 6, 2001, a fact crucial to proving fraudulent use of a credit card and burglary.[40] Accordingly, we conclude that insufficient evidence supports the counts the State alleged involving the Vons' transaction on May 6, 2001.[41] However, with respect to the remaining charges, we conclude that adequate circumstantial evidence supports Jezdik's convictions.[42]

## CONCLUSION

We conclude that the district court did not err in permitting the State to rebut Jezdik's denial of prior accusations on direct examination. Further, we decline to reach Jezdik's claims of ineffective assistance of counsel during this direct appeal, and with the exception of the two counts related to the alleged Vons' transaction, we conclude that sufficient evidence supports the jury's verdict. Accordingly, we reverse the burglary and fraudulent use convictions related to the May 6, 2001, Vons' transaction, and affirm the remainder of the judgment of conviction.

DOUGLAS and PARRAGUIRRE, JJ., concur.

---

[40]See Evans v. State, 117 Nev. 609, 641, 28 P.3d 498, 520 (2001) (the defendant must show prejudice as a result of an information that does not provide proper notice of the charges against him).

[41]See Hernandez v. State, 118 Nev. 513, 531, 50 P.3d 1100, 1112 (2002) ("In reviewing the sufficiency of the evidence, this court must determine whether the jury, acting reasonably, could have been convinced by the competent evidence of the defendant's guilt beyond a reasonable doubt.").

[42]See id. (stating that "circumstantial evidence alone may support a conviction").