129 Nev., Advance Opinion 24

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| SHAWN TIMOTHY NEWMAN,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 56151<br><br>**FILED**<br><br>APR 18 2013 |

Appeal from a judgment of conviction, pursuant to a jury verdict, of battery by strangulation and willfully endangering a child as a result of child abuse. Second Judicial District Court, Washoe County; Patrick Flanagan, Judge.

*Affirmed.*

Jeremy T. Bosler, Public Defender, and Cheryl Bond, Appellate Deputy Public Defender, Washoe County,
for Appellant.

Catherine Cortez Masto, Attorney General, Carson City; Richard A. Gammick, District Attorney, and Gary H. Hatlestad, Chief Appellate Deputy District Attorney, Washoe County,
for Respondent.

---

BEFORE PICKERING, C.J., HARDESTY and CHERRY, JJ.

*OPINION*

By the Court, PICKERING, C.J.:

Appellant Shawn Newman appeals his conviction, on jury verdict, of one count of willfully endangering a child as a result of child

13-11424

abuse, a gross misdemeanor, and one count of battery by strangulation, a felony. The charges grew out of an incident in which Newman yelled at his son, Darian, in public; when Newman took off his belt to strike the boy, a witness, Thomas Carmona, tried but failed to stop him. Newman and Carmona fought until Newman grabbed Carmona's neck to choke him into submission. At trial, Newman admitted these facts and that he acted intentionally. His defense was justification: parental discipline privilege as to the child abuse charge; and, to some extent, self-defense as to the battery charge.

Newman raises two issues on appeal, both rooted in NRS 48.045's prohibition against using character or prior-bad-act evidence to prove criminal propensity. First, the prosecution introduced evidence that Newman had struck his other son, Jacob, in public and that Newman got into a heated argument with nursing staff about Jacob while Darian was hospitalized for an appendectomy. The district court deemed this evidence admissible under NRS 48.045(2) to show absence of mistake or accident as to the child abuse charge. Second, the prosecution presented a surprise rebuttal witness, Connie Ewing, who reported that she, too, had a heated but nonphysical exchange with Newman over his disciplining a young boy outside a local Walmart. The district court allowed this testimony as rebuttal under NRS 48.045(1)(a) and NRS 48.055, to rebut Newman's testimony that he strangled Carmona in self-defense.[1]

---

[1]Newman also argues ineffective assistance of trial counsel based on his lawyer's statement to the district court, arguing against the admission of Ewing's testimony, that she would have urged Newman not to testify if she had known about Ewing. We normally do not "consider ineffective-assistance-of-counsel claims on direct appeal unless the district court has held an evidentiary hearing on the matter or an evidentiary hearing would

*continued on next page...*

 

Evidence of one of the episodes involving Jacob was properly admitted to refute Newman's claim of parental privilege. The other episodes involving Jacob were not proven by clear and convincing evidence, as required by our case law, and it was an abuse of discretion to admit the Ewing testimony. Nonetheless, Newman's guilt was established by his own admissions and overwhelming evidence. We therefore conclude that the errors were harmless and affirm.

## I.

## A.

The incident underlying this appeal occurred on September 14, 2009. At the time, Newman was a single father raising two sons: twelve-year-old Darian and six-year-old Jacob. Darian had started middle school the previous week. Jacob's day care opened at 7 a.m. and Darian needed to be to middle school by 7:30 a.m. The family's apartment was close to both. Darian had recently gotten a bike with gear-speeds. The plan was for Darian, who felt uncomfortable riding double with Jacob, to walk Jacob and the bicycle to Jacob's day care and to ride from there to middle school. The timing was tight and the first week this plan did not work out. One day, Newman went looking for Darian along what he thought was his route but could not find him. Another day, Darian got lost and was tardy.

---

...*continued*
be needless." *Archanian v. State,* 122 Nev. 1019, 1036, 145 P.3d 1008, 1020-21 (2006). The district court did not hold an evidentiary hearing and one would be needed to determine whether Newman would have testified no matter what his lawyer said. Therefore, we do not reach his ineffective-assistance-of-counsel claim.

Six weeks earlier, in late July, Darian had been hospitalized for appendicitis. A secondary infection developed that extended his hospital stay to 19 days. The wound was dressed, not sutured closed, meaning it had to be cleaned and the dressing changed daily while the open incision healed. On September 14, the wound had mostly closed but still required daily dressing, which Newman attended to.

On the day of the incident, Newman followed Darian in his truck to see his son's exact route. All went well until Darian, who had his new bike in third gear, could not make it up a hill. Newman got out of his truck, put and rode the bike in lower gear to show Darian how the gearing worked, and then held the bike for Darian to try. For whatever reason— Newman testified he saw Darian deliberately slip his foot off the pedal, while Darian told a responding officer he was tired and his stomach hurt— Darian did not succeed, even in the lower gear. Admittedly angry, Newman started yelling at Darian. He gave Darian an ultimatum: ride the bike up the hill or be spanked. Darian let go of his bike, went to a low wall nearby, and bent over to be spanked.

From his home across the street, Thomas Carmona heard the commotion and saw Newman take off his belt. Carmona ran over to stop him from striking the boy. They argued over Newman's right to physically discipline his child and then fought. The fight did not end until Newman pinned Carmona to the ground in a stranglehold. Carmona and Newman accused each other of throwing the first blow. Newman is bigger than Carmona and, unlike Carmona, looked none the worse for wear after their fight. Carmona and another eyewitness described Newman as in a rage and Darian as crying uncontrollably. One witness testified that Darian said his father terrified him.

When the police arrived, they found a red welt on Darian's buttocks, which they photographed. They also photographed Darian's abdominal bandage and healing incision. Paramedics examined Darian and Carmona but did not take either to the hospital. Carmona's Adam's apple was sore and it hurt to swallow for some days afterward.

B.

Trial took four days. The prosecution presented its case-in-chief through eyewitness, responding officer, and expert medical testimony without using any prior-bad-act evidence. After the prosecution rested, the district court advised Newman of his right to testify in his own defense. The prosecution warned that it would explore prior bad acts if Newman testified that parental privilege justified his discipline of Darian.

The district court then heard from the lawyers on the prior-bad-act issue. No testimony was presented; the lawyers argued from a child protective services (CPS) report that the appellate record does not include. The transcript reveals that the CPS report lists two of the three incidents involving Jacob as "information only" under a heading, "unsubstantiated reports," and that the police investigated one of the incidents but could not verify it. Despite this, the district court determined that the following incidents were established by clear and convincing evidence and could be used by the prosecution if Newman testified: (1) Newman hit Jacob in November 2006, February 2009, and late July or early August 2009 when Darian was in the hospital; and (2) Newman had an ugly verbal run-in with hospital staff during Darian's stay. Although the court deemed this evidence more probative than prejudicial, it did not identify a permissible nonpropensity purpose for admitting it until later in the trial, when it held that the evidence tended to show absence of mistake or accident as to the child abuse charge.

 

Newman elected to testify. His direct-examination testimony hewed close to the events of September 14. He gave background concerning Darian's appendectomy and recuperation and explained why he followed Darian by truck instead of just driving him to school that day. He admitted that he gave Darian the choice of riding up the hill or being spanked; that he struck Darian on the buttocks with his belt, raising a welt; and that he fought with Carmona and put him in a stranglehold when Carmona would not back off. Finally, Newman testified that Carmona attacked him, not the reverse. He conceded being angry and loud but denied being out of control.

On cross-examination, the prosecution asked Newman about the hospital incidents in late July/early August 2009. Newman admitted that he "smacked" Jacob on the back of the head for bouncing on Darian's bed and that he eventually got into such a heated argument with hospital staff over Darian's care and his and Jacob's use of a break room that he was told to leave and not come back. The prosecution had Newman acknowledge that he "grew up on the streets," is "on the hard side," and can be perceived as "an aggressive, loud, obnoxious kind of person." He said, "I don't hide anything I do. I will spank my children in public as I will in private." Newman described his progressive discipline of his sons, ranging from raised voice, to corner time, to spanking. He also described the special tutoring he had arranged for Darian and later Jacob at the University of Nevada Reno and expressed pride in Darian's reading level. When the prosecution asked Newman about the November 2006 and February 2009 incidents with Jacob mentioned (but not substantiated) in the CPS report, Newman said he did not recall either.

The defense then called the psychologist who counseled Darian after the charges in this case led to Darian and Jacob being removed from Newman's care. The psychologist characterized Newman's parenting style as between "authoritarian" and "autocratic" but also opined that Darian and Newman had "a fairly normal parent/child relationship." He testified that he had no qualms when Darian and Jacob were returned to Newman's care shortly before trial.

After the defense rested, the prosecution alerted the court and the defense counsel to Connie Ewing, who came forward after reading about the case in the newspaper. She related an incident involving a stranger she now recognized as Newman yelling and hitting a boy outside Walmart in early September 2009. When she demanded that he stop, Newman told her to "mind [her] own f#$%ing business." Ewing went inside to complain to the Walmart greeter and then security and Newman followed. Two security guards flanked Ewing while she and Newman argued about single parenting and appropriate discipline. No physical contact occurred and eventually Newman left. Over defense objection, the district court admitted this evidence to rebut Newman's testimony that Carmona attacked him first. The prosecution did nothing to prove the November 2006 and February 2009 incidents involving Jacob that Newman testified he did not know about or recall.

In closing, neither side argued the prior-bad-act evidence involving Jacob. The Ewing testimony was alluded to but briefly. During deliberation, the jury sent out two questions, both concerning the child abuse count. Ultimately, it returned a verdict of guilty and the district court sentenced Newman to a maximum term of 60 months incarceration

for the battery with a consecutive term of 12 months for child endangerment.

## II.

NRS 48.045(2) prohibits the use of evidence of "other crimes, wrongs or acts . . . to prove the character of a person in order to show that the person acted in conformity therewith." Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* NRS 48.045(2)'s list of permissible nonpropensity uses for prior-bad-act evidence is not exhaustive. *Bigpond v. State*, 128 Nev. ___, ___, 270 P.3d 1244, 1249 (2012). Nonetheless, while "evidence of 'other crimes, wrongs or acts' may be admitted . . . for a relevant nonpropensity purpose," *id.* (quoting NRS 48.045(2)), "'[t]he use of uncharged bad act evidence to convict a defendant [remains] heavily disfavored in our criminal justice system because bad acts are often irrelevant and prejudicial and force the accused to defend against vague and unsubstantiated charges.'" *Id.* (quoting *Tavares v. State*, 117 Nev. 725, 730, 30 P.3d 1128, 1131 (2001)). Thus, "'[a] presumption of inadmissibility attaches to all prior bad act evidence.'" *Id.* (quoting *Rosky v. State*, 121 Nev. 184, 195, 111 P.3d 690, 697 (2005)).

"[T]o overcome the presumption of inadmissibility, the prosecutor must request a hearing and establish that: (1) the prior bad act is relevant to the crime charged and for a purpose other than proving the defendant's propensity, (2) the act is proven by clear and convincing evidence, and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *Bigpond*, 128 Nev. at ___, 270 P.3d at 1250. In addition, the district court "should give the jury a specific instruction explaining the purposes for which the evidence is

admitted immediately prior to its admission and should give a general instruction at the end of the trial reminding the jurors that certain evidence may be used only for limited purposes." *Tavares*, 117 Nev. at 733, 30 P.3d at 1133.

This court reviews a district court's decision to admit or exclude prior-bad-act evidence under an abuse of discretion standard. *Fields v. State*, 125 Nev. 785, 789, 220 P.3d 709, 712 (2009).

## A.

Identification of an at-issue, nonpropensity purpose for admitting prior-bad-act evidence is a necessary first step of any NRS 48.045(2) analysis. *See United States v. Miller*, 673 F.3d 688, 697 (7th Cir. 2012) (addressing Fed. R. Evid. 404(b), the cognate to NRS 48.045(2)). Here, the district court ultimately declared that it was admitting the prior-bad-act evidence involving Jacob to show absence of mistake or accident. "The admissibility of evidence of other crimes, wrongs, or acts to establish . . . absence of mistake or accident is well established, particularly in child abuse cases." *United States v. Harris*, 661 F.2d 138, 142 (10th Cir. 1981). This is because "[p]roof that a child has experienced injuries in many purported accidents is evidence that the most recent injury may not have resulted from yet another accident." *Bludsworth v. State*, 98 Nev. 289, 292, 646 P.2d 558, 559 (1982).

But Newman did not mount a conventional accidental injury defense to the child abuse charge. He admitted striking Darian and doing so deliberately. Thus, proof that Newman previously struck Darian's brother Jacob does not tend to disprove accidental injury, a common defense to a child abuse charge. Neither mistake nor accident was at issue, and the prior incidents involving Jacob should not have been admitted for these irrelevant purposes. *See Honkanen v. State*, 105 Nev.

SUPREME COURT
OF
NEVADA

(O) 1947A

901, 902, 784 P.2d 981, 982 (1989) (reversing a child abuse conviction based on an error in admitting evidence of prior abuse to show absence of mistake where, as here, the parent did not claim accident or mistake explained the injuries).

The prosecution argues that, even if not properly admitted to show absence of mistake or accident, the prior-bad-act evidence involving Jacob was admissible to refute Newman's parental privilege defense by demonstrating that Newman did not have the intent to correct that forms the heart of that defense.

A number of states have codified the parental privilege defense. *See Willis v. State*, 888 N.E.2d 177, 181 n.5 (Ind. 2008) (identifying jurisdictions with parental privilege statutes). Nevada has not, so in Nevada the privilege exists by virtue of common law, *see* NRS 1.030; 3 William Blackstone *Commentaries* 120 (1862) ("battery is, in some cases, justifiable or lawful; as where one who hath authority, a parent or master, gives moderate correction to his child, his scholar, or his apprentice," *quoted in Willis*, 888 N.E.2d at 180-81), and by virtue of the "fundamental liberty interest [a parent has] in maintaining a familial relationship with his or her child [which includes] the right . . . 'to direct the upbringing and education of children.'" *Willis*, 888 N.E.2d at 180 (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925)) (citing *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978)).

This appeal does not require us to decide the exact boundaries of the common law parental privilege defense in Nevada, because neither side contests the instruction the district court gave on it. *See Willis*, 888 N.E.2d at 181-82 (comparing the different parental privilege formulations offered by Model Penal Code § 3.08(1) (1985) and Restatement (Second) of

SUPREME COURT
OF
NEVADA

(O) 1947A

Torts § 147(1) (1965)). At minimum, as both sides concede, the defense required the prosecution to establish that Newman did not "'intend[ ] to merely discipline [Darian but] . . . to injure'" or endanger him. *State v. Hassett*, 859 P.2d 955, 960 (Idaho Ct. App. 1993) (quoting Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 5:10 (1993)); *see State v. Thorpe*, 429 A.2d 785, 788 (R.I. 1981) (the privilege is lost "at the point at which a parent ceases to act in good faith and with parental affection and acts immoderately, cruelly, or mercilessly with a malicious desire to inflict pain."

The intent underlying parental discipline and battery are not the same. "A parent who disciplines a child in a physical manner intends to correct or alter their child's behavior. That corrective intent is lacking in a battery." *Ceaser v. State*, 964 N.E.2d 911, 917 (Ind. Ct. App. 2012), *transfer denied*, 969 N.E.2d 86 (Ind. 2012). "[O]ften the only way to determine whether the punishment is a non-criminal act of discipline that was unintentionally harsh or whether it constitutes the [crime] of child abuse is to look at the parent's history of disciplining the child." *State v. Taylor*, 701 A.2d 389, 396 (Md. 1997). In such cases, "[a] parent's other disciplinary acts can be the most probative evidence of whether his or her disciplinary corporal punishment is imposed maliciously, with an intent to injure, or with a sincere desire to use appropriate corrective measures." *Id.*; *see People v. Taggart*, 621 P.2d 1375, 1384-85 (Colo. 1981) (recognizing that prior acts of excessive discipline may be admissible to "negat[e] any claim of accident or justification"), *abrogated on other grounds by James v. People*, 727 P.2d 850, 855 (Colo. 1986), *overruled by People v. Dunaway*, 88 P.3d 619, 624 (Colo. 2004); *Ceaser*, 964 N.E.2d at 917 ("By arguing that she exercised her parental privilege in disciplining M.R., Ceaser

necessarily represents that her intent was to correct M.R.'s behavior through corporal punishment, rather than to simply batter her daughter," making admissible the defendant's prior conviction for battering her child); *State v. Morosin*, 262 N.W.2d 194, 197 (Neb. 1978) (recognizing as "peculiarly applicable to child abuse cases" the principle that, "'[w]here an act is equivocal in its nature, and may be criminal or honest according to the intent with which it is done, then other acts of the defendant, and his conduct on other occasions, may be shown in order to disclose the mastering purpose of the alleged criminal act'" (quoting 1 *Wharton's Criminal Evidence* § 350, at 520 (11th ed.))).

The parental privilege defense comes down to "punishment—was it cruel or abusive"—or did it amount to a parent's "use [of] reasonable and moderate force to correct [his] child[ ]"? *State v. Wright*, 593 N.W.2d 792, 801 (S.D. 1999) (applying South Dakota's statutory parental privilege, S.D. Codified Laws § 22-18-5). Here, the district court should have identified the relevant nonpropensity purpose for admitting evidence of the prior incidents involving Jacob before weighing its probative value against its potential for unfair prejudice. It also incorrectly held that the prior incidents involving Jacob tended to show absence of mistake or accident, neither of which was at issue. Nevertheless, the evidence did have probative value in assessing Newman's intent in inflicting corporal punishment on Darian, which Newman's assertion of the parental privilege defense placed squarely in issue.[2]

---

[2]We recognize that *Honkanen v. State*, 105 Nev. 901, 784 P.2d 981 (1989) (3-2), suggests a contrary rule. Thus, after rejecting absence of mistake as a basis for admitting prior instances of abuse in a child abuse prosecution because the parental privilege defense asserted did not raise

*continued on next page...*

SUPREME COURT
OF
NEVADA

(O) 1947A

B.

Identification of an at-issue, nonpropensity purpose for admitting this evidence is only the first step of a proper NRS 48.405(2) analysis. *United States v. Miller*, 673 F.3d at 697. In addition, the prosecution must establish the prior bad act by clear and convincing evidence and demonstrate that its probative value "is not substantially outweighed by the danger of unfair prejudice." *Bigpond*, 128 Nev. at ___, 270 P.3d at 1249.

Judged by these standards, the district court did not abuse its discretion in admitting evidence that Newman cuffed Jacob on the back of his head at the hospital in late July or early August 2009. Newman admitted the incident, and it had enough probative value to justify the

---

*...continued*

an issue of mistake, *Honkanen* also notes that, "Furthermore, contrary to the district attorney's suggestion on appeal, neither was appellant's intent [in issue]." *Honkanen*, 105 Nev. at 902, 784 P.2d at 982. This passing reference in a 3-2 decision does not settle the intent issue, because *Honkanen* did not consider the difference between intent to injure or inflict pain and intent to correct. Additionally, *Honkanen*'s rationale may be outdated in light of the 2001 amendments to NRS 48.061, which expand the use of bad-act evidence in domestic violence cases, 2001 Nev. Stat., ch. 360, § 1, at 169; *see* NRS 233.018(1)(a) (defining "domestic violence" to include battery on an accused's minor child), and *Bigpond*, which recognizes that character evidence can be admissible so long as it has a credible, nonpropensity purpose, such as explaining the relationship dynamics between a domestic-violence victim and the accused. 128 Nev. at ___, 270 P.3d at 1246; *see also Harris v. State*, 195 P.3d 161, 182 (Alaska Ct. App. 2008) (recognizing that the holding in *Harvey v. State*, 604 P.2d 586, 590 (Alaska 1979), a case similar to *Honkanen*, had been abrogated by the amendment of Alaska's Rule 404(b) to allow admission of prior incidents of domestic violence as an exception to the general rule against admitting such evidence).

district court's determination that its worth outweighed the risk of unfair prejudice. But the same cannot be said of the November 2006 and February 2009 incidents involving Jacob. These incidents were merely mentioned in a CPS report as "information only" and "unsubstantiated." As such, they were not established by the clear and convincing evidence required to sustain their admission.

## C.

It was also error for the district court to admit the evidence that Newman was aggressive to hospital staff and Ewing under NRS 48.045(2). Although the district court suggested that this evidence went toward absence of mistake or accident, it had no logical relevance to Newman's parental privilege defense. It also appears too factually dissimilar to the battery-by-strangulation charge to have been admissible to refute Newman's claim that he acted in self-defense in strangling Carmona. Specifically, neither the hospital nor the Walmart incidents went beyond an exchange of angry words. In neither instance did Newman physically attack a stranger based on a mistaken belief that his life was in danger. Although Newman claimed he was fighting for his life, he never argued that he did not intend to hurt Carmona, accidentally grabbed his throat, or was otherwise not at fault for Carmona's injuries.

## III.

NRS 48.045(1)(a) permits the prosecution to offer "similar evidence" to rebut evidence offered by an accused "of a person's character or a trait of his or her character." Normally, such proof is by "testimony as to reputation or in the form of an opinion," NRS 48.055; "when a defendant chooses to introduce character evidence in the form of reputation or opinion evidence, the prosecution is similarly limited in its rebuttal evidence and can only inquire into specific acts of conduct on

cross-examination." *Jezdik v. State*, 121 Nev. 129, 136, 110 P.3d 1058, 1063 (2005); *see* NRS 48.055(1). And, under the collateral-fact rule, extrinsic evidence, other than a conviction, may not be offered to impeach a defendant's character evidence, NRS 50.085(3), except "when the State 'seeks to introduce evidence on rebuttal to contradict specific factual assertions raised during the accused's direct examination.'" *Jezdik*, 121 Nev. at 138, 110 P.3d at 1064 (quoting 1 Kenneth S. Broun et al., *McCormick on Evidence* § 49, at 202 (5th ed. 1999)). But the exception is limited. It applies when the defendant "introduce[s] evidence giving the jury a false impression through an absolute denial of misconduct" and then relies on the collateral-fact rule to "frustrate the State's attempt to contradict this evidence through proof of specific acts." *Id.* at 139, 110 P.3d at 1065.

Here, the district court admitted Ewing's testimony to rebut character evidence from Newman. It also held that the collateral-fact rule did not apply because the Ewing incident resembled Newman's confrontation with Carmona and occurred less than two weeks earlier. We disagree for three reasons.

First, Ewing's testimony about an extrinsic event did not rebut character evidence from Newman. The crux of Ewing's testimony was that Newman is a violent, aggressive man. This was not appropriate rebuttal because Newman never claimed to be a peace-loving or nonviolent man. Jezdik opened the door to a specific rebuttal by swearing on direct examination to having never committed a crime. *Jezdik*, 121 Nev. at 134, 110 P.3d at 1062. On direct examination, Newman stuck close to the facts and made no affirmative claim to good character. And under cross-examination, he openly admitted to being aggressive and churlish,

especially when criticized for disciplining his children. Nor did Ewing's testimony negate self-defense. Whereas Newman testified that he is capable of violence when faced with a life-threatening situation, Ewing's testimony only showed that Newman is confrontational and given to swear words. Although Ewing's testimony may have been relevant if Newman had physically attacked her and then claimed self-defense, the evidence showed that the altercation at the Walmart store only involved words, not blows, and thus differed fundamentally from the incident with Carmona.

Second, evidence of Newman's character was collateral. As we noted in *Lobato v. State*, the use of specific acts of conduct raises issues under the collateral-fact rule when coupled with a specific contradiction. 120 Nev. 512, 519, 96 P.3d 765, 770 (2004). Here, although enough evidence supported a self-defense instruction as to the battery-by-strangulation charge, this did not make Newman's penchant for verbal combativeness an issue. By allowing Ewing's testimony, the district court improperly allowed evidence of one of Newman's prior bad acts—his confrontation with Ewing—for the sole, irrelevant purpose of showing he is not a peace-loving man.

Finally, Ewing's testimony did not comply with the requirements of NRS 48.055. She did not give an opinion or discuss Newman's reputation, but rather testified about a specific event. The testimony was not proper because Ewing discussed a specific instance of conduct that was not, and could not have been, previously raised by Newman or explored by the prosecution in its cross-examination of him. And as we held in *Roever v. State*, it is improper to use evidence of specific acts that the accused has not previously been confronted with. 114 Nev. 867, 871, 963 P.2d 503, 505 (1998).

Therefore, we conclude that the district court abused its discretion in admitting Ewing's rebuttal testimony. We now consider whether the district court's errors were harmless or warrant reversal.

IV.

"The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). It also "promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Id.* A nonconstitutional error, such as the erroneous admission of evidence at issue here, is deemed harmless unless it had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Tavares v. State*, 117 Nev. 725, 732, 30 P.3d 1128, 1132 (2001) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fields v. State*, 125 Nev. 776, 784-85, 220 P.3d 724, 729-30 (2009) (reviewing erroneous admission of evidence, pursuant to NRS 48.045, as nonconstitutional error); *Richmond v. State*, 118 Nev. 924, 934, 59 P.3d 1249, 1255-56 (2002) (reviewing the failure to exclude evidence in a *Petrocelli* hearing for harmless error); *Rosky v. State*, 121 Nev. 184, 198, 111 P.3d 690, 699 (2005) ("Errors in the admission of evidence under NRS 48.045(2) are subject to a harmless error review.").

We have carefully reviewed the record in this case and conclude that the error in allowing the prosecution to ask Newman about the November 2006 and February 2009 incidents involving Jacob was harmless. The jury heard nothing with respect to those incidents beyond the prosecution asking Newman if he recalled either; the prosecution accepted Newman's answer that he did not. The jury was instructed that it "must not speculate to be true any insinuations suggested by a question

Supreme Court
OF
Nevada

(O) 1947A

17

asked a witness" and that "[a] question is not evidence." We must presume that the jury followed those instructions. *Allred v. State*, 120 Nev. 410, 415, 92 P.3d 1246, 1250 (2004). Under those circumstances, and given Newman's frank admissions and overwhelming evidence on the child abuse charge, the error in allowing the prosecution to ask about the November 2006 and February 2009 incidents cannot be said to have had a substantial and injurious effect on the verdict.

In the unique circumstances of this case, we also find the error in admitting the Ewing testimony and allowing Newman to be questioned about his trespass from the hospital to have been harmless. Newman's battery-by-strangulation conviction rested on his testimony admitting that he put Carmona in a stranglehold and held his hands around his throat for 30 seconds or more—testimony that numerous eyewitnesses corroborated. Newman's defense focused on the absence of substantial bodily harm to Carmona, and only minimally on self-defense. And the prosecution made almost no use of the Ewing testimony. For these reasons, we are convinced that the error in admitting the Ewing testimony and allowing the prosecution to question Newman about his trespass from the hospital did not have a substantial and injurious effect on the verdict.

The erroneously admitted evidence was a miniscule and unnecessary part of the prosecution's case and merely repeated what jurors already knew based on admissible evidence—that Newman is an admittedly aggressive, obnoxious man who hits his children and bullies anyone who criticizes his parenting. As the district court observed, this case was only conceptually challenging, as the facts were remarkably clear. While we will not hesitate to reverse a judgment of conviction when

evidentiary error taints an accused's right to a fair trial, such did not occur here.

We therefore affirm.

_____, C.J.
Pickering

I concur:

_____, J.
Hardesty

SUPREME COURT
OF
NEVADA

(O) 1947A

CHERRY, J., concurring in part and dissenting in part:

The majority correctly holds that some of the episodes involving Newman's son, Jacob, were not proven by clear and convincing evidence as required by our caselaw, and that it was an abuse of discretion to admit the testimony of surprise rebuttal witness Connie Ewing. The analysis of these errors by the majority is outstanding and can be considered a landmark holding in the often contested area of NRS 48.045's prohibition against using character or prior-bad-act testimony to prove criminal responsibility.

My problem with the majority is the holding that these errors were harmless and that said errors did not taint Newman's right to a fair trial.

I would hold that these substantial errors rooted in NRS 48.045 and the prohibition against using character or bad-act-testimony to prove criminal responsibility are structural and require reversal of appellant's convictions and the granting of a new trial without the prosecution using these structural errors of inadmissible and highly prejudicial evidence.

It is also important to note that after appellant testified in his own behalf and the defense rested, the trial court permitted Connie Ewing to testify after she came forward after reading about the case in the newspaper. This was not only "trial by ambush," but also was clearly inadmissible testimony. How can the majority justify this testimony as harmless error?

The majority further states that "in closing neither side argued the prior-bad-act evidence involving Jacob" and that "the Ewing testimony was alluded to but briefly." To me this justification for

concluding that the errors were harmless is not supported in the law or the facts of this case and is not relevant to the issue of harmless error.[1]

One last thought:

> in any test of harmless error, and in any case, an appellate court has only probabilities to go on, not certainties. Nonetheless, when it undertakes to evaluate the probabilities in terms of an error's effect on the judgment, instead of merely looking at the result as the test of harmlessness, the judicial process at the trial level as well as in appellate review stands to make a long-term gain in fairness without any long-term loss in efficiency. In the long run there would be closer guard against error at the trial, if appellate courts were alert to reverse, in case of doubt, for error that could have contaminated the judgment.[2]

In light of the burden of proof beyond a reasonable doubt on a prosecutor in a criminal case and the nature of the errors confirmed by the

---

[1]*See Randolph v. State*, 117 Nev. 970, 984, 36 P.3d 424, 433 (2001) (noting that the jury was instructed that "'[s]tatements, arguments and opinions of counsel are not evidence in the case'"(alteration in original)); *Greene v. State*, 113 Nev. 157, 169, 931 P.2d 54, 61 (1997) (reiterating the district court's admonishment that "arguments of counsel are not evidence, as I've told you earlier, and neither are the personal beliefs of counsel as to—as to the implications of that evidence'"), *overruled on other grounds by Byford v. State*, 116 Nev. 215, 235, 994 P.2d 700, 713 (2000); *Flanagan v. State*, 112 Nev. 1409, 1420, 930 P.2d 691, 698 (1996) (highlighting the jury instruction that "'[s]tatements, arguments and opinions of counsel are not evidence in the case'" (alteration in original)); *Bonacci v. State*, 96 Nev. 894, 896-97, 620 P.2d 1244, 1246 (1980) (reiterating the district court's admonishment that "'arguments of counsel are not evidence'").

[2]Roger J. Traynor, *The Riddle of Harmless Error* 22-23 (1970).

 

majority, I would reverse appellant's convictions and grant him a new trial.

                                         _____, J.
                                         Cherry