136 Nev., Advance Opinion 78

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| THOMAS WILLIAM RANDOLPH,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 73825<br><br>**FILED**<br><br>DEC 10 2020<br>ELIZABETH A. BROWN<br>CLERK OF SUPREME COURT<br>BY _____<br>CHIEF DEPUTY CLERK |

Appeal from a judgment of conviction, pursuant to a jury verdict, of conspiracy to commit murder and two counts of first-degree murder with the use of deadly weapon. Eighth Judicial District Court, Clark County; Stefany Miley, Judge.

*Reversed and remanded.*

Sandra L. Stewart, Mesquite,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and David L. Stanton and Charles W. Thoman, Chief Deputy District Attorneys, Clark County,
for Respondent.

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, SILVER, J.:

A jury convicted appellant Thomas Randolph of conspiring with a hitman to have his sixth wife murdered during a staged burglary and then murdering the hitman. In this appeal, we consider whether the events surrounding the death of Randolph's second wife were admissible under

NRS 48.045(2), which provides that evidence of other bad acts is inadmissible unless offered to prove something other than the defendant's criminal propensity. Because the danger of unfair prejudice substantially outweighed any probative value, we hold that the district court abused its discretion in admitting the prior-bad-act evidence. And, because the State did not meet its burden of proving the error was harmless, we reverse the judgment of conviction and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

On the evening of May 8, 2008, Randolph called 9-1-1 to report that an intruder shot his wife and that he shot and killed the intruder. Law enforcement responded and discovered the bodies of Sharon Randolph and Michael Miller. Sharon died of a single gunshot wound to the head. Miller sustained five gunshot wounds, two of them to the head.

According to Randolph, when he and Sharon returned home from a night out, Sharon exited the vehicle and entered the house while he pulled their vehicle into the garage. After lingering in the garage, he then entered the house to find Sharon lying face down in the hallway. Startled by unexpected movement, Randolph grabbed one of his handguns from a nearby room and encountered a masked intruder. Randolph scuffled with the intruder in the hallway before shooting him multiple times. The intruder collapsed in the garage, where Randolph fired two more shots into the intruder's head. Randolph recognized the intruder as Miller, a person whom he had befriended a few months before and with whom he had looked at jet skis mere hours before the home invasion.

The scene of the killings raised a number of questions about Randolph's version of events, and detectives began to suspect that Randolph was involved in Sharon's murder based on inconsistencies between his story and the physical evidence. Further stoking suspicions about Randolph's

involvement, law enforcement uncovered evidence that Randolph took out multiple life insurance policies on Sharon before the killings and had an extensive, secretive relationship with Miller. For example, the two men often spoke in private and exchanged hundreds of phone calls in the months before the alleged burglary. Additionally, prosecutors learned that Randolph's second wife, Becky, died in Utah in 1986 from a single gunshot wound to the head. Although Becky's death was initially considered a suicide, Utah authorities ultimately charged Randolph with Becky's murder based largely on information obtained from Randolph's former friend Eric Tarantino. According to Tarantino, he and Randolph met while working together. They became friends, and Tarantino worked odd jobs for Randolph after he was laid off. The friendship changed when Randolph began asking generally whether Tarantino could hurt someone. Their discussions eventually focused on killing Randolph's then-wife Becky during different scenarios, such as a staged burglary of Randolph's home. Randolph indicated to Tarantino that he wanted Becky killed so he could collect the money from her life insurance policies.

During the Utah criminal proceedings, Randolph solicited an undercover police officer to "whack" Tarantino before Tarantino could testify against him at trial. To achieve that end, Randolph dispatched his then-girlfriend Wendy Moore to deliver payment to the purported hitman. After the exchange, Utah authorities charged Randolph for the incident, and he pleaded guilty to felony witness tampering. In 1989, a Utah jury acquitted Randolph on the murder charge. Randolph subsequently had all the records related to his prosecution for murder and conviction for witness tampering expunged in Utah.

In this case, the State charged Randolph with conspiracy to commit murder and two counts of murder with the use of a deadly weapon,

also filing a notice of intent to seek the death penalty for both murders.[1] The State theorized that Randolph enlisted Miller to kill Sharon during a staged burglary in order to collect the proceeds from her life insurance policies, and after Miller shot and killed Sharon, Randolph shot and killed Miller. Before trial, the State filed a pretrial motion seeking to admit the Utah evidence to prove motive, intent, preparation, plan, knowledge, and identity. The district court held a *Petrocelli*[2] hearing where the State called a single witness—William McGuire, the prosecutor at Randolph's murder trial in Utah—to provide an offer of proof. Over Randolph's objection, the district court found the Utah evidence admissible in the Nevada trial. At trial, the State presented extensive testimony of the Utah events from McGuire, as well as from Utah Detective Scott Conley, Tarantino, and Moore. After deliberations, the jury convicted Randolph on all counts and sentenced him to death. This appeal followed.

## DISCUSSION

The primary question on appeal is whether the district court abused its discretion in admitting prior-bad-act evidence of the Utah events at trial. Evidence of other crimes, wrongs, or acts is prohibited to prove a person's character or propensity to act in conformity with a character trait. NRS 48.045(2). However, such evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* The proponent of prior-bad-act evidence "must request a hearing and establish that: (1) the prior bad act is relevant to the crime charged and for a purpose other than

---

[1]The State also charged Randolph with burglary while in possession of a deadly weapon but later dismissed that charge.

[2]*Petrocelli v. State*, 101 Nev. 46, 692 P.2d 503 (1985), *superseded in part by statute as stated in Thomas v. State*, 120 Nev. 37, 83 P.3d 818 (2004).

proving the defendant's propensity, (2) the act is proven by clear and convincing evidence, and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *Bigpond v. State*, 128 Nev. 108, 117, 270 P.3d 1244, 1250 (2012). We review the admission of prior-bad-act evidence for an abuse of discretion. *Newman v. State*, 129 Nev. 222, 231, 298 P.3d 1171, 1178 (2013).

*The State's pretrial offer of proof*

We first consider the State's method of proving the prior bad acts by making an offer of proof. Generally, "[a]n offer of proof provides an evidentiary basis for a district court's decision." *Santiago v. State*, 644 N.W.2d 425, 442 (Minn. 2002). The district court must be satisfied that the offer will lead to the introduction of legally admissible evidence. "[A]n adequate offer of proof can be made without producing all the witnesses if the offer is sufficiently specific and there is nothing in the record to indicate the proponent's bad faith or inability to produce the proof." Robert P. Mosteller, ed., *McCormick on Evidence* § 51 (8th ed. 2020) (internal footnote omitted). NRS 47.080 contemplates "offers of proof in narrative or question and answer form." Thus, when the State seeks to admit prior-bad-act evidence, it can apprise the court of what the prior-bad-act evidence will be or present the evidence through witness testimony.

In this case, the State chose the latter method by calling McGuire to testify. Among Randolph's objections to McGuire's testimony, he argued that McGuire did not witness any of his alleged misconduct and could only offer hearsay. The State contended that offers of proof were necessarily based on hearsay. Over Randolph's objections, the district court allowed McGuire to testify.

We conclude that the district court erred in finding the State proved the prior bad acts by clear and convincing evidence based on

SUPREME COURT
OF
NEVADA

(O) 1947A

McGuire's testimony alone. The record shows that while McGuire testified about investigating Becky's death and Randolph's attempts to have Tarantino killed, he had no firsthand knowledge about Randolph's attempts to recruit Tarantino to kill Becky or Randolph's ultimate conviction for witness tampering because he did not prosecute that case. The majority of McGuire's testimony consisted of explaining what Tarantino and other Utah authorities told him. His lack of firsthand knowledge about the actual bad acts the State sought to admit is problematic. *See Lane v. Second Judicial Dist. Court*, 104 Nev. 427, 446, 760 P.2d 1245, 1257 (1988) ("[T]o be competent to testify, a witness must have personal knowledge of the subject of his testimony."); *see also* Robert P. Mosteller, ed., *supra*, § 10 ("[A] person who has no knowledge of a fact except what another has told her does not satisfy the requirement of knowledge from observation for that fact."). Accordingly, the State's offer of proof proved very little.

Further, the jury in Becky's murder trial acquitted Randolph. This casts additional doubt on the district court's finding that the State proved the Utah acts by clear and convincing evidence. While "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof," *Dowling v. United States*, 493 U.S. 342, 349 (1990), Randolph's acquittal certainly should have raised concerns for the district court about the quality of Tarantino's proposed testimony as relayed by McGuire. Because the State's only offer of proof was made through a witness with limited firsthand knowledge, we conclude the district court abused its discretion in finding that the prior bad acts were proven by clear and convincing evidence based on the State's offer of proof made by this

witness.[3] *Cf. Salgado v. State*, 114 Nev. 1039, 1043, 968 P.2d 324, 327 (1998) (providing that, after an offer of proof, clear and convincing evidence can only be established when "combined with the quality of the evidence actually presented to the jury").

*Relevance for a permissible purpose*

We next address the district court's finding that the Utah evidence was relevant for a proper purpose. To be relevant, evidence need only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable." NRS 48.015. We conclude the district court improperly allowed the State's witnesses to testify to irrelevant and prejudicial facts related to the Utah events.

The district court found the Utah evidence relevant to Randolph's motive, intent, preparation, plan, knowledge, and identity. Some of the prior-bad-act evidence was relevant for a nonpropensity purpose. For example, regarding the relevance of Randolph's attempts to convince Tarantino to kill Becky for a portion of her life insurance benefits and soliciting Tarantino's murder after he cooperated with Utah authorities, we agree with the district court that these acts may have had relevance for a proper nonpropensity purpose under NRS 48.045(2). Randolph claimed that he justly killed an intruder and only realized after

---

[3]We note that this error is not dispositive because other witnesses with firsthand knowledge testified at trial. *See Qualls v. State*, 114 Nev. 900, 903, 961 P.2d 765, 767 (1998) (providing that "a rule of automatic reversal for failure to conduct a proper *Petrocelli* hearing, regardless of a lack of prejudicial effect caused by the admission of the evidence, cannot be justified").

the shooting that it was Miller, a person he knew and had a relationship with. Thus, evidence that Randolph previously attempted to recruit Tarantino to kill his then-wife Becky during a staged burglary for her life insurance payout may have been relevant to Randolph's involvement with Miller or his intent to enter into the conspiracy.[4] *See United States v. Adams*, 401 F.3d 886, 898-99 (8th Cir. 2005) (finding evidence related to the defendant's involvement in an earlier drug conspiracy and his falling out with members of that conspiracy was relevant to show his intent to enter into a new conspiracy under NRS 48.045(2)'s federal analog).

While the district court's pretrial decision seemingly admitted two discrete bad acts (Randolph attempted to convince Tarantino to kill Becky for a portion of her life insurance proceeds and solicited Tarantino's murder after he cooperated with Utah authorities), the actual presentation of the Utah events is problematic. Specifically, at trial, the State presented many additional bad acts related to the Utah events that far exceeded the scope of its offer of proof upon which the district court determined the evidence was admissible.

Tarantino, Moore, and Conley all gave irrelevant and prejudicial testimony at trial. First, in addition to recounting Randolph's attempts to convince him to kill Becky for a portion of her life insurance proceeds, Tarantino testified that Randolph beat him so severely that he suffered an injured spleen and torn back muscles, among other injuries. Randolph loaded Tarantino into his car, drove him to his wife's workplace, continued to beat him, and dumped him in the parking lot. Randolph then entered Tarantino's wife's workplace and put the bloody gloves he had been

---

[4]Because we have determined that the acts discussed above were relevant for a nonpropensity purpose, we need not address whether they were relevant for all the purposes identified by the district court.

wearing on the counter. The jury also heard that Tarantino needed to be hospitalized to treat his wounds and that, within hours of his release from the hospital, Randolph showed up at Tarantino's home, inflicted another beating, and stole Tarantino's medications. Randolph threatened to kill him if he told anyone about the assaults. These bad acts had no relevance to prove that Randolph solicited Miller to kill Sharon for her life insurance proceeds and then murdered Miller during the staged burglary. Additionally, Moore testified that she dated Randolph while he awaited trial for Becky's murder. During that time, he directed Moore to deliver a car title to another individual. Believing this individual would aid Randolph's legal defense, Moore agreed to deliver the document, bringing her eight-year-old son along. After she handed over the document, Utah law enforcement put a gun to Moore's head and arrested her. While possibly having some relevance to the State's theory that Randolph killed Miller to silence him as a potential witness, the evidence was needlessly cumulative, *see* NRS 48.035(2), because McGuire and Conley had already testified that Randolph had been charged with conspiring to murder Tarantino and that he pleaded guilty to felony tampering with a witness. Finally, in addition to explaining that Randolph had been charged for his efforts to solicit Tarantino's murder, Detective Conley suggested that Randolph ran in a "circle" of people associated with other criminal acts, which had no relevance to the charged crimes. These additional bad acts only served to show Randolph's bad character or his predisposition to commit violent crimes. *See Longoria v. State*, 99 Nev. 754, 756, 670 P.2d 939, 940 (1983) (holding the prosecutor improperly questioned the defendant about a prior, unrelated incident because the evidence principally demonstrated the defendant's bad character). This evidence therefore was not admissible under NRS 48.045(2).

SUPREME COURT OF NEVADA

(O) 1947A

*Balancing the probative value and the danger of unfair prejudice*

Finally, we consider the district court's finding that the probative value of the Utah evidence was not substantially outweighed by the danger of unfair prejudice, and we conclude the district court erred. While relevant evidence is generally admissible, *see* NRS 48.025, "[a] presumption of inadmissibility attaches to all prior bad act evidence." *Rosky v. State*, 121 Nev. 184, 195, 111 P.3d 690, 697 (2005). The presumption of inadmissibility guards against unfair prejudice that may undermine an accused's right to a fair trial by enticing jurors to resolve a case based on emotion, sympathy, or another improper reason disconnected from an impartial evaluation of the evidence. *See State v. Eighth Judicial Dist. Court (Armstrong)*, 127 Nev. 927, 933-34, 267 P.3d 777, 781 (2011) (discussing different forms of unfair prejudice); *see also Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("'[U]nfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."). "In assessing 'unfair prejudice,'" we look to the basis for the admission of prior-bad-act evidence and "the use to which the evidence was actually put." *Fields v. State*, 125 Nev. 785, 790, 220 P.3d 709, 713 (2009). When balancing probative value against the danger of unfair prejudice, courts consider a variety of factors,

> including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*State v. Castro*, 756 P.2d 1033, 1041 (Haw. 1988) (quoting E.W. Cleary, *McCormick on Evidence* § 190 (3d ed. 1984)); *see also Franks v. State*, 135 Nev. 1, 6, 432 P.3d 752, 756 (2019) (applying similar factors to the admission

of prior sexual offenses to show propensity under NRS 48.045(3) (citing *United States v. LeMay*, 260 F.3d 1018, 1028 (9th Cir. 2001))).

Randolph's attempts to enlist Tarantino to kill Becky and later soliciting his murder have some similarities to the present case—Randolph purportedly wanted to have both Becky and Sharon killed for their life insurance benefits, sought a friend to aid him in each plot, and then pursued a means to silence those friends in an attempt to insulate himself from criminal liability. Randolph, however, was acquitted of the murder charge in Utah, which goes to the strength of Tarantino's testimony, as the jury in Utah heard the same evidence and entered a verdict of not guilty. *See* 2 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 8:25 (2020) (discussing that "the lack of a conviction reduces the probative value of the uncharged misconduct evidence"). And the Utah events occurred more than 20 years before the Nevada killings. In those intervening decades, Randolph had three other marriages before marrying Sharon. Finally, while the Utah evidence bolstered the State's case, the State had other evidence from which the jury could infer the criminal conspiracy and that Randolph was not an innocent bystander or victim. *See Old Chief*, 519 U.S. at 184 ("'[P]robative value' . . . may be calculated by comparing evidentiary alternatives."). The State presented evidence that Randolph took out life insurance policies for Sharon and that he was overly concerned about the money from Sharon's estate, providing a motive. The State also presented circumstantial evidence of the conspiracy between Randolph and Miller that detailed their extensive, secretive relationship. *See Gaitor v. State*, 106 Nev. 785, 790 n.1, 801 P.2d 1372, 1376 n.1 (1990) (providing that the agreement to conspire is rarely shown by direct evidence and is instead usually inferred by circumstantial evidence and the conduct of the parties), *overruled on other grounds by Barone v. State*, 109 Nev. 1168, 866 P.2d 291

(1993). For example, in the months before the incident, the two men exchanged almost 300 phone calls, most of them initiated by Randolph. They often had lengthy private conversations outside Miller's residence and in a back room at Randolph's residence. And Miller told his aunt and uncle shortly before his death that he was planning on moving away from Nevada and that he and Randolph were coming into a large sum of money.

But ultimately, the State lured the jury into finding Randolph guilty based on myriad other bad acts that were not even marginally relevant for a nonpropensity purpose, rather than constraining the testimony to evidence relevant to the charged offenses.[5]  Notably, Tarantino's testimony about Randolph inflicting multiple beatings, stealing his medication, and threatening him only served to show Randolph's bad character or his predisposition to commit violent crimes. Moore's testimony unfairly prejudiced Randolph by indicating that he had the propensity to use and endanger his romantic partners for his own ends. Put another way, Randolph lied to Moore about the nature of delivering the car title, placed her and her eight-year-old child in mortal danger, and exposed her to grave criminal liability. And Conley's testimony implied Randolph associated with other criminals. Moreover, the State and the Utah witnesses repeatedly referred to Becky's death in the context of Randolph being arrested and tried for her murder. Despite the State's representations that Becky's death was not at issue and the district court's order to refer to her

---

[5]As discussed above, the record reflects that, at trial, the State presented extensive testimony regarding bad acts that went far beyond the offer of proof elicited from the testimony of the one witness from the *Petrocelli* hearing.

death as "the Utah case," the extensive discussion of the murder prosecution strongly implied that Randolph was wrongfully acquitted in the Utah case.[6] The danger inherent in admitting prior-bad-act evidence "is particularly great where . . . the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged." *United States v. Beechum*, 582 F.2d 898, 914 (5th Cir. 1978); *see also* Edward J. Imwinkelried, *supra*, § 8:25 ("[T]he lack of a conviction creates the probative danger that the jury will conclude that the defendant unjustly escaped conviction for the uncharged crime.").

In sum, this evidence only served to show the jury that Randolph is a deceitful and violent man. Given the negligible relevance to the Nevada charges, it is clear that these myriad bad acts functioned only to prove propensity, i.e., that Randolph is a bad person, prone to committing, or attempting to commit, brutal crimes, so he must have committed the charged crimes. *See Propensity, Black's Law Dictionary* (11th ed. 2019) ("A natural tendency to behave in a particular way; esp., the fact that a person is prone to a specific type of bad behavior."). Because the district court did not sufficiently limit the State's presentation of the Utah evidence, the jury was inundated with evidence of Randolph's bad character. *See Harris v. State*, 134 Nev. 877, 880, 432 P.3d 207, 211 (2018) ("NRS 48.035 requires the district court to act as a gatekeeper by assessing

---

[6]Both at oral argument and below, the State argued that the Utah evidence was not a relitigation of Becky's death and conceded that her death had little relevance to the Nevada case. In fact, in its decision to admit the prior-bad-act evidence, the district court noted that the State "is not seeking to introduce the Utah case to show that [Randolph] actually murdered Becky Randolph." Accordingly, the repeated references during trial to her death in the context of murder was overly prejudicial.

SUPREME COURT
OF
NEVADA

(O) 1947A

the need for the evidence on a case-by-case basis and excluding it when the benefit it adds is substantially outweighed by the unfair harm it might cause."); *see also People v. Denson*, 902 N.W.2d 306, 316 (Mich. 2017) ("It is incumbent on a trial court to vigilantly weed out character evidence that is disguised as something else." (internal quotation marks omitted)). Given the deluge of bad character evidence, the danger that the Utah evidence would be used for the forbidden purpose of convicting Randolph simply because he is a bad person drastically increased. Consequently, the jury could believe that, because Randolph did it before, he must have done it again—or as the State put it: "It's the conspiracy, it just came back into fruition 20 years later . . . . The only thing he did was change up the players and change up the outcome." This strengthens the impression that "the evidence was presented or argued at trial for its forbidden tendency to prove propensity." *Fields*, 125 Nev. at 790, 220 P.3d at 713. Therefore, considering these factors, we conclude the danger of unfair prejudice substantially outweighed any probative value of the Utah evidence, and the district court abused its discretion by allowing its admission.[7]

---

[7]Given the glut of bad-act evidence, we are unconvinced the district court's terse limiting instruction effectively addressed or allayed the substantial prejudice in this case. *See Chavez v. State*, 125 Nev. 328, 345, 213 P.3d 476, 488 (2009) (providing that the district court must "issue a limiting instruction to the jury about the limited use of bad act evidence"). Here, the district court's instruction only referred to "the Utah matters" without specifying what specific evidence or acts the jury could consider, and, by simply listing nearly every exception under NRS 48.045(2), the jury had little guidance on the purpose of the evidence or how the exceptions applied. *See United States v. McGill*, 815 F.3d 846, 889 (D.C. Cir. 2016) (providing that a proper limiting instruction "should identify the evidence at issue and the particular purpose for which a jury could permissibly use it, rather than providing an incomplete description of the evidence at issue and an undifferentiated laundry list of evidentiary uses that may confuse more than it instructs").

*Harmless error*

Having concluded that the district court abused its discretion by admitting the prior-bad-act evidence, we must determine whether the error was harmless. *See Rosky*, 121 Nev. at 198, 111 P.3d at 699 ("Errors in the admission of evidence under NRS 48.045(2) are subject to a harmless error review."). Such an error is harmless only "if it did not have a substantial and injurious effect or influence in determining the jury's verdict," *Hubbard v. State*, 134 Nev. 450, 459, 422 P.3d 1260, 1267 (2018), and "[t]he State bears the burden of proving that the error was harmless." *Belcher v. State*, 136 Nev., Adv. Op. 31, 464 P.3d 1013, 1023 (2020).

In this case, the State argues that any error in the admission of the prior-bad-act evidence was harmless because the State needed only to show the evidence was relevant for one permissible purpose under NRS 48.045(2) and because the evidence of guilt was overwhelming. The first argument is inconsequential. Having concluded that the danger of unfair prejudice substantially outweighed any probative value of the Utah evidence, the State cannot salvage its case by identifying a permissible, nonpropensity reason to admit the evidence. The State's second argument is insufficient to carry its burden. That argument amounts to a brief generalized statement that *any error* in the case is harmless based on "extensive and compelling evidence" of Randolph's guilt. But the State then references a section of its answering brief that discusses both the evidence that Randolph conspired with Miller and the prior-bad-act evidence. We cannot look to the prior-bad-act evidence to conclude that the error in admitting that evidence was harmless. The State offers no other meaningful assessment of the evidence against Randolph aside from the prior-bad-act evidence or whether the erroneously admitted prior-bad-act evidence influenced the verdict. *See Kotteakos v. United States*, 328 U.S.

750, 765 (1946) ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence."). Thus, although the State did argue harmlessness, its failure to provide any substantive analysis leaves this court in the same position as if the State had not argued harmlessness at all—we are left with the question of whether to dive into the depths of that review sua sponte. *Cf. Belcher*, 136 Nev., Adv. Op. 31, 464 P.3d at 1024; *see also Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) (providing that a party must "present relevant authority and cogent argument; issues not so presented need not be addressed by this court"). We will do that only in extraordinary cases. *Belcher*, 136 Nev., Adv. Op. 31, 464 P.3d at 1023.

When deciding whether to review harmlessness sua sponte, we consider "'(1) the length and complexity of the record, (2) whether the harmlessness of an error is certain or debatable, and (3) the futility and costliness of reversal and further litigation.'" *Id.* at 1024 (quoting *United States v. Rodriguez*, 880 F.3d 1151, 1164 (9th Cir. 2018) (internal quotation marks omitted)). Here, these factors weigh against sua sponte review. This case presents a complex and lengthy 41-volume record spanning over eight years of proceedings. At oral argument the State equivocated about its ability to secure a conviction absent the prior-bad-act evidence, signaling the harmlessness of the error is surely debatable here. And concerns over the cost or futility of further litigation do not justify making the State's argument for it. Therefore, absent an adequate presentation by the State, we decline to sua sponte evaluate whether the error at issue in this death

Supreme Court
of
Nevada

(O) 1947A

16

penalty case is harmless. Accordingly, we reverse the judgment of conviction and remand this matter for a new trial.[8]

_____ , J.
Silver

We concur:

_____ , C.J.
Pickering

_____ , J.
Gibbons

_____ , J.
Hardesty

_____ , J.
Parraguirre

_____ , J.
Stiglich

_____ , J.
Cadish

---

[8]Randolph also argues that his right to a speedy trial was violated, the State presented insufficient evidence to support his conviction for conspiracy to commit murder, and the death penalty is unconstitutional. We have considered these claims and conclude they lack merit. And, given our disposition in this matter, we need not address Randolph's other claims of error.